# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

JESSICA PARM and LISA FLAGG, on Behalf of Themselves and All Others Similarly Situated,

       Plaintiffs,

       vs.

BMO HARRIS BANK, N.A., FOUR OAKS BANK & TRUST CO., a North Carolina Chartered Bank, NATIONAL BANK OF CALIFORNIA, NORTH AMERICAN BANKING CO., a Minnesota Chartered Bank, and FIRST PREMIER BANK, a South Dakota State-Chartered Bank,

       Defendants.

**CIVIL ACTION NO.** `1:13-cv-03326-JEC`

**<u>CLASS ACTION COMPLAINT</u>**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT**

**JURY TRIAL DEMANDED**

Plaintiffs Jessica Parm and Lisa Flagg, individually and on behalf of the Class described below, by their attorneys, make the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiffs and their counsel, which are based on personal knowledge.

1

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action against Defendants BMO Harris Bank, N.A. ("BMO"), Four Oaks Bank & Trust Co. ("Four Oaks"), National Bank of California ("NBCal"), North American Banking Co. ("NABC"), and First Premier Bank ("First Premier") (collectively "Defendants") to recover damages and other relief available at law and in equity on behalf of themselves as well as on behalf of members of the class who have been injured by Defendants' participation in a scheme to access and utilize the Automated Clearing House ("ACH") network to collect unlawful debts in violation of 18 U.S.C. § 1962 and the law of numerous states, including Georgia.

2.      This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendants, arising from their participation in schemes to collect on "payday loans" in states that have made payday loans unlawful.

3.      Payday loans—small loans due in full on the borrower's next "payday"—have a long and sordid history.  For years, unscrupulous lenders have taken advantage of desperate borrowers who are unable to obtain funds anywhere else in order to make ends meet, by offering loans at usurious and unconscionable

rates.  Payday lenders operate on the shadowy fringe of the mainstream financial system.

4.      At least thirteen states across the nation have either banned payday loans directly or effectively banned them by operation of an interest rate cap. Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, and West Virginia (the "banned states"), and the District of Columbia.

5.      Certain payday lenders—many based offshore or purportedly on Indian reservations—make use of the Internet to circumvent these prohibitions and offer payday loans to consumers residing in these states while ignoring the laws prohibiting those very loans (the "Out-Of-State Payday Lenders").  These loans ("Out-Of-State Payday Loans") feature interest rates of 400%, 500%, and higher.

6.      Out-Of-State Payday Lenders' ability to defy state law rests on the cooperation of financial institutions like Defendants that knowingly "originate" illicit payday loan debits and credits in the mainstream electronic payments system (the "Automatic Clearing House" or "ACH Network").  These banks, known as Originating Depository Financial Institutions ("ODFIs") act as middlemen between illicit Out-Of-State Payday Lenders and the mainstream electronic payments system.

7.     Indeed, it would be impossible for Out-Of-State Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts in states where the loans are illegal and unenforceable without Defendants' willingness to allow the Out-Of-State Payday Lenders to access the ACH Network.

8.     BMO, Four Oaks, NBCal, NABC, and First Premier, acting as ODFIs, actively participate in this unlawful scheme by working at the request of Out-Of-State Payday Lenders to "originate" ACH entries that represent payday loan credits and debits to and from consumer checking accounts, thereby enforcing debts they know to be unlawful.

9.     Defendants know that they are crediting and debiting consumers' accounts for unlawful purposes because they know they are acting at the request of Out-Of-State Payday Lenders and that the entries they originate on the ACH Network at the request of such Out-Of-State Payday Lenders will credit or debit funds in states in which the Out-Of-State Payday Lenders' loans are illegal and unenforceable.  Defendants are required by federal banking regulations and the rules of the ACH Network to know the identities of the entities for which they originate transactions and to assure themselves that such transactions do not violate state or federal law.

10.     Defendants' illegal schemes with Out-Of-State Payday Lenders have victimized Plaintiffs and millions of others.  Unless enjoined, Defendants will continue to engage in these schemes and cause substantial injury to consumers.

## PARTIES

11.     Plaintiff Jessica Parm ("Parm") is a citizen and resident of LaFayette, Georgia.

12.     Plaintiff Lisa Flagg ("Flagg") is a citizen and resident of Decatur, Georgia.

13.     Defendant BMO is a national banking association incorporated in the State of Delaware with main offices at 111 West Monroe Street, Chicago, Illinois.

14.     Defendant Four Oaks is a North Carolina state-chartered bank with main offices at 6144 US Highway 301 South, Four Oaks, North Carolina.

15.     Defendant NBCal is a national bank incorporated in the State of California with main offices at 12121 Wilshire Boulevard, 14th Floor, Los Angeles, California.

16.     Defendant NABC is a Minnesota state-chartered bank with main offices at 2230 Albert Street, Roseville, Minnesota.

17.     Defendant First Premier is a South Dakota state-chartered bank with main offices at 601 South Minnesota Avenue, Sioux Falls, South Dakota.

## OTHER PERSONS AND ENTITIES

18.    The "Out-Of-State Payday Lenders" include, but are not limited to, the following:

a.    Plain Green, LLC ("Plain Green") is an entity located in the Rocky Boy Indian Reservation in Box Elder, Montana and maintains a website with an IP Address of 66.55.41.169 with an associated domain name of **www.plaingreenloans.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Plain Green engaged in the practice of making and did make illegal payday loans by making such loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Plain Green is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

(A)    unenforceable because of state or federal laws against usury;

(B)    incurred in connection with the business of lending money at an usurious rate; and

(C)    the usurious rate was at least twice the enforceable rate.

b.    Red Rock Tribal Lending, LLC ("Red Rock") is an entity located in Watersmeet, Michigan and maintains a website with an IP

Address of 174.143.186.165 with an associated domain name of **www.castlepayday.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Red Rock engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Red Rock is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

      (A)    unenforceable because of state or federal laws against usury;

      (B)    incurred in connection with the business of lending money at an usurious rate; and

      (C)    the usurious rate was at least twice the enforceable rate.

    c.    Western Sky Financial, LLC ("Western Sky") is an entity which claims to be operating as a tribal online payday lender organized and existing under the laws of South Dakota with a principal place of business at 612 E Street, Timber Lake, South Dakota.  Up until September 2, 2013, Western Sky maintained and operated a website with an IP Address of 74.202.203.70 with an associated domain name of **www.westernsky.com** for the purpose of making illegal Out-Of-State Payday Loans.  Prior to

suspending its online payday loan operations on September 2, 2013 amid multiple lawsuits and mounting pressure from state and federal regulators challenging Western Sky's lending practices, and at all times relevant hereto, Western Sky engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Western Sky was in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

> (A)  unenforceable because of state or federal laws against usury;

> (B)  incurred in connection with the business of lending money at an usurious rate; and

> (C)  the usurious rate was at least twice the enforceable rate.

d.  Great Plains Lending, LLC ("Great Plains") is an entity located in Timber Lake, South Dakota and maintains a website with an IP Address of 66.55.41.140 with an associated domain name of **www.greatplainslending.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Great Plains engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are

prohibited outright.  Great Plains is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

    (A)    unenforceable because of state or federal laws against usury;

    (B)    incurred in connection with the business of lending money at an usurious rate; and

    (C)    the usurious rate was at least twice the enforceable rate.

    e.    BlueChip Financial, LLC ("BlueChip") is an entity located in Belcourt, North Dakota and maintains a website with an IP Address of 107.22.190.34 with an associated domain name of **www.spotloan.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, BlueChip engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  BlueChip is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

    (A)    unenforceable because of state or federal laws against usury;

    (B)    incurred in connection with the business of lending money at an usurious rate; and

9

(C)    the usurious rate was at least twice the enforceable rate.

f.    CashCall, Inc. ("CashCall") is an entity located in Anaheim, California and maintains a website with an IP Address of 74.202.203.100 with an associated domain name of **www.cashcall.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, CashCall engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  CashCall is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

(A)    unenforceable because of state or federal laws against usury;

(B)    incurred in connection with the business of lending money at an usurious rate; and

(C)    the usurious rate was at least twice the enforceable rate.

g.    First National Funding, Inc.  ("First National") is an entity located in Sandy, Utah which advertises short-term payday loans on billboards and over the radio, using various trade names, across the United States.  First National is in the business of making and collecting "unlawful

10

debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

    (A)    unenforceable because of state or federal laws against usury;

    (B)    incurred in connection with the business of lending money at an usurious rate; and

    (C)    the usurious rate was at least twice the enforceable rate.

## JURISDICTION AND VENUE

19.    Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(c) and (d), which confers jurisdiction upon this Court over the subject matter of this action. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

20.    Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because this lawsuit has been brought as a class action, the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and one or more of the members of the putative Class is a resident of a different state than Defendants.

21.    This Court has personal jurisdiction over every Defendant pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965.

22.    This Court has personal jurisdiction over BMO pursuant to O.C.G.A. §9-10-91 in that BMO has engaged in a continuous and systematic course of doing business in the state by, *inter alia,* maintaining a permanent office at 3333 Piedmont Road NE, Atlanta, Georgia.

23.    Alternatively, this Court has personal jurisdiction over BMO pursuant to O.C.G.A. §9-10-91(2) in that BMO personally or through an agent committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

24.    Alternatively, this Court has personal jurisdiction over Four Oaks pursuant to O.C.G.A. §9-10-91(2) in that Four Oaks personally or through an agent committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

25.     Alternatively, this Court has personal jurisdiction over NBCal pursuant to O.C.G.A. §9-10-91(2) in that NBCal personally or through an agent committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

26.     Alternatively, this Court has personal jurisdiction over NABC pursuant to O.C.G.A. §9-10-91(2) in that NABC personally or through an agent committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

27.     Alternatively, this Court has personal jurisdiction over First Premier pursuant to O.C.G.A. §9-10-91(2) in that First Premier personally or through an agent committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

28.     Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here and because BMO, Four Oaks, NBCal, NABC and First Premier are subject to personal jurisdiction here.

## BACKGROUND FACTS
### Payday Loans

29.     A payday loan is a short-term (typically a matter of weeks) closed-end single payment loan.  A borrower obtaining a payday loan must either provide a personal check to the lender or an authorization to electronically debit the borrower's deposit account for the loan amount and associated fee as security for the loan.  If the borrower does not repay the loan or make arrangements to extend the loan, the lender can deposit the borrower's check or initiate an electronic withdrawal from the borrower's deposit account.

30.     Payday loans target the most vulnerable and desperate of borrowers, who might not qualify for a conventional unsecured loan or who are in such desperate need of cash that they cannot wait for the formal approval process that a conventional unsecured loan requires.

31.     Payday loans feature exorbitant interest rates (sometimes misleadingly referred to as "fees") and require "balloon" repayments shortly after the loan is made.

32.     If a borrower is unable to repay the full amount of the loan on the due date, the lender typically gives the borrower the option to "roll over" the loan balance by paying another "fee", usually equal to the initial fee at the time of loan funding.  The cycle then continues until such time as the borrower is either able to pay off the loan in full or the borrower defaults on the loan.

33.      Many borrowers repeatedly roll over or take out additional payday loans, often on the same day as a previous one is repaid.  Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay off the original debt.

34.     For these and other reasons, Georgia and twelve other states and the District of Columbia have outlawed payday loans.

35.     In Georgia, a transaction is civilly usurious when it imposes an annual interest rate exceeding 16% per annum for loans with a principal amount of less than $3,000.  O.C.G.A. §7-4-2.  By statute, a usurious loan is void and unenforceable, and the borrower is relieved from the obligation to repay both the

principal and any accrued interest.  Further, loans with an interest rate exceeding 5% per month are criminally usurious in Georgia under O.C.G.A. §7-4-18.

36.    Out-Of-State Payday Lenders, while not permitted to operate in the banned states and the District of Columbia, have simply moved to the Internet in order to solicit desperate borrowers in the banned states and the District of Columbia into illegal loans using an online application process.  This scheme could not have been accomplished without the complicity of Defendants who provide Out-Of-State Payday Lenders with access to the ACH Network.

### The ACH Network

37.    The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing.  Instead of using paper to carry necessary transaction information, such as with checks, ACH Network transactions are transmitted electronically, allowing for faster processing times and cost savings.

38.    The ACH Network processes two types of transactions: Direct Deposits via ACH and Direct Payments via ACH.  Direct Deposit via ACH is the deposit of funds for payroll, employee expense reimbursement, government benefits, tax and other refunds, and annuities and interest payments.  It includes any ACH credit payment from a business or government to a consumer.

39.   "Direct Payment" is the use of funds to make a payment via ACH. Individuals or organizations can make a Direct Payment via ACH as either an ACH credit or ACH debit.  A Direct Payment processed as an ACH credit puts funds into an account.  An example of this is when a consumer initiates a payment through his/her bank or credit union to pay a utility bill.  A Direct Payment processed as an ACH debit takes funds from the customer's account and transfers those funds to the utility company's account.

40.   In 2012, the ACH Network processed more than 21 billion transactions, with a total dollar value of $36.9 trillion.  That year, the ACH Network processed 9.79 billion ACH debit transactions and 6.96 billion ACH credit transactions.

41.   Rules and regulations that govern the ACH network are established by NACHA (formerly the National Automated Clearing House Association) and the Federal Reserve.  NACHA manages the development, administration, and governance of the ACH Network.  BMO is a "Direct Financial Institution Member of NACHA" and influences the governance and direction of the ACH Network and the NACHA Operating Rules by participating in the NACHA Rule Making Process, voting directly on Rules ballots, and by participating in and leading NACHA Councils, committees, and initiatives.  As a Direct Financial Institution

Member of NACHA, BMO is eligible to serve on the NACHA Board of Directors

and further shape regulatory, legislative, and ACH Network policies.

42.     An ACH transaction takes place in many steps.  First, an

accountholder (called a "Receiver") authorizes a transaction with a merchant—the

business or person providing a good or service.  That merchant (called an

"Originator") then communicates the purported authorization to its ODFI.  The

ODFI is a bank and a member of the ACH Network.  The ODFI then "originates"

the ACH debit or credit through the pass-through "ACH Operator" to the

accountholder's bank, known as the Receiving Depository Financial Institution

("RDFI").  The RDFI is also a member of the ACH Network, and is the entity that

actually makes the credit or debit on its customer's checking or savings account.

43.     There are also "Third-Party Service Providers" which are entities

other than the Originator, ODFI, or RDFI that perform any function on behalf of

the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A

"Third-Party Sender" is a type of Third-Party Service Provider that has an ACH

agreement with the Originator, and the ODFI's ACH agreement is with the Third-

Party Sender and not the Originator.

44.     The NACHA Rules specifically require all parties involved in the

processing of ACH transactions to adhere to all state and federal laws in the United

States.  These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

45.    The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and merchants.  The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems. The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users. Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to detect and prevent fraud and abusive financial transactions.

46.    NACHA Rules also require specific responsibilities for ODFIs, as discussed below.

### ODFIs Have Special Duties under NACHA
### Operating Rules and Guidelines

47.    NACHA characterizes ODFIs as "the gatekeepers of the ACH Network."  As the party that enables an Originator—such as Out-Of-State Payday Lenders – to initiate debit entries on the ACH Network, NACHA operating rules require an ODFI to enter into an Origination Agreement with each Originator for

which it will originate entries on the ACH Network or have an arrangement with a

Third-Party Sender that has such an Origination Agreement.  NACHA 2012

Operating Rules, Section 2.2, Subsection 2.2.1.

48.    An ODFI undertakes critical responsibilities under the NACHA Rules

that reflect the reliance of the ACH Network on appropriate underwriting and

monitoring of Originators by ODFIs.

49.    Under the NACHA Rules, "[a]n ODFI is responsible for all Entries

originated through the ODFI whether by an Originator or through a Third-Party

Sender  . . . [a]n ODFI is responsible for its Originators' and Third-Party Senders'

compliance with these Rules."  NACHA 2012 Operating Rules, Section 2.1.

50.    NACHA Rules require all ODFIs to conduct a risk assessment of their

ACH activities, including, *inter alia*, "assessing the nature of risks associated with

ACH activity; performing appropriate know-your-customer due diligence; and

having adequate management, information and reporting systems to monitor and

mitigate risk."  *See* NACHA Operating Guidelines, Chapter 4.

51.    The NACHA Operating Guidelines caution that "ODFIs that choose

to originate ACH entries . . . should be aware that both they and their Originators

are subject to the NACHA Operating Rules and applicable U.S. law when

transmitting these entries." NACHA 2012 Operating Guidelines, Chapter 3

OFAC Requirements and Obligations, OG13.

52.     When an ODFI transmits an ACH entry, it is warranting to each RDFI

and ACH Operator that—among other things—the entry has been properly

authorized. NACHA 2012 Operating Rules Section 2.4, Subsection 2.4.1.1 (a).

53.     With regard to debit entries from consumer accounts (such as those

that represent loan repayments to Out-Of-State Payday Lenders), an authorization

that is "otherwise invalid under applicable Legal Requirements does not satisfy the

requirements" of an "authorization" under the NACHA Rules. NACHA 2012

Operating Rules Section 2.3, Subsection 2.3.2.3 (b).

54.     Further, Subsection 2.2.1.1-2 of the NACHA Rules requires ODFIs to

enter into a written agreement with every Third-Party Sender or Originator (or

merchant) for whom they originate ACH entries. That agreement is to include an

"agree[ment] not to originate Entries that violate the laws of the United States;" a

"restriction on the types of entries that may be originated" and must include "the

right of the ODFI to audit the Originator's or Third-Party Sender's compliance

with the Origination Agreement and these Rules."

55.     Further, ODFIs have clear duties to "know your customer" and the

NACHA Operating Rules make clear that they are intended to reflect that

21

principle.  NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements

and Obligations, OG13.

56.    On March 14, 2013, NACHA issued an advisory in response to

certain negative press reports about collusion of ACH members with payday

lenders.  In the release, NACHA reiterated the important policing duties of ODFIs:

"[E]ach ODFI is responsible for the valid authorization of every ACH debit

processed in its name . . . In the case of authorizations from consumers, the

NACHA Rules are explicit that, among other things, the authorization must 'be

readily identifiable as an authorization'; and 'have clear and readily understandable

terms.'  ***If a purported authorization is invalid under applicable law, it does not***

***meet this standard***." (Emphasis added).

57.    NACHA went on to say:

> Because of these obligations, as well as associated reputational and
> other risks, the Federal banking agencies advise that ODFIs should,
> among other things, (i) exercise appropriate risk-based diligence
> when bringing on new Originators and Third-Party Senders and (ii)
> perform appropriate monitoring to determine whether excessive
> returns or other suspicious patterns of activity warrant further review
> or more aggressive action.  For example, in 2006 the Office of the
> Comptroller of the Currency (OCC) released its risk management
> guidance for ACH activities by national banks, OCC Bulletin 2006-
> 39, in which it cautioned national banks acting as ODFIs to perform a
> risk-based evaluation of new Originators, including their historic
> patterns of unauthorized returns and whether they are engaged in
> legitimate business activities.

58.     The NACHA Operations Bulletin instructed ACH participants as follows: "ACH participants are strongly encouraged to establish business practices that ensure that ACH transactions do not facilitate illegal activity."

59.     In August 2013, NACHA sent a letter to banks warning them that authorizing access to customer accounts for Out-Of-State Payday Lenders or their Third-Party Senders could violate NACHA rules.  In the letter, NACHA stated that under its rules, "purported authorizations to pay illegal loans that are unenforceable under applicable state law" are not valid.

## The FDIC Has Issued Guidance to State-Chartered Banks that Enter Into Payment Processor Relationships with Third Parties

60.     The Federal Deposit Insurance Corporation ("FDIC") regulates state-chartered banks.

61.     On February 25, 2005, the FDIC issued guidance regarding payday lending and cautioned that such lending raises "significant risks" for banks, particularly when the payday lenders initiate through Third-Party Senders.  The FDIC guidance makes clear that:

> The use of third parties in no way diminishes the responsibility of the board of directors and management to ensure that the third-party activity is conducted in a safe and sound manner and in compliance with policies and applicable laws. Appropriate corrective actions, including enforcement actions, may be pursued for deficiencies related to a third-party relationship that pose

concerns about either safety and [sic] soundness or the adequacy of protection afforded to consumers.

62. On June 6, 2008, the FDIC issued additional "Guidance for Managing Third-Party Risk" which began by noting that:

An institution's board of directors and senior management are ultimately responsible for managing activities conducted through third-party relationships, and identifying and controlling the risks arising from such relationships, to the same extent as if the activity were handled within the institution.

63. Among the risks to banks the FDIC identified in its June 6, 2008 "Guidance for Managing Third-Party Risk" was:

Compliance risk. Compliance risk is the risk arising from violations of laws, rules, or regulations, or from noncompliance with internal policies or procedures or with the institution's business standards. This risk exists when the products or activities of a third party are not consistent with governing laws, rules, regulations, policies, or ethical standards. For example, some third parties may engage in product marketing practices that are deceptive in violation of Section 5 of the Federal Trade Commission Act . . . Compliance risk is exacerbated when an institution has inadequate oversight, monitoring or audit functions.

64. Accordingly, the FDIC advises banks to engage in "Due Diligence in Selecting a Third Party":

Following an assessment of risks and a decision to proceed with a plan to establish a third-party relationship, management must select a qualified entity to implement

the activity or program.  The due diligence process provides management with the information needed to address qualitative and quantitative aspects of potential third parties to determine if a relationship would help achieve the financial institution's strategic and financial goals and mitigate identified risks. Not only should due diligence be performed prior to selecting a third party, but it should also be performed periodically during the course of the relationship, particularly when considering a renewal of a contract.

\*\*\*

Comprehensive due diligence involves a review of all available information about a potential third party, focusing on the entity's financial condition, its specific relevant experience, its knowledge of applicable laws and regulations, its reputation, and the scope and effectiveness of its operations and controls.

### The OCC Has Issued Guidance to All Banks On Managing the Risks of ACH Activity

65.    The OCC supervises national banks.

66.    On September 1, 2006, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity, explaining that "[n]ational banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party."

67.    The guidance advised:

High-Risk Activities

Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face

25

increased reputation, credit, transaction, and compliance risks. High-risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks. The board should provide clear direction to management on whether, or to what extent, the bank may engage in such ACH activities. Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders.

68.     In a footnote to the guidance, the OCC made the risk to banks even

clearer, "*[r]isks may include the risk of legal liability* or damage to an institution's

reputation *when originators or third-party senders facilitate or engage in*

*activities that violate criminal laws*." (Emphasis added)

69.     On April 24, 2008, the OCC provided guidance for national banks and

examiners on managing the risks of ACH activity initiated by Third-Party

Processors, cautioning that:

Banks should also consider carefully the legal, reputation, and other risks presented by relationships with processors including risks associated with customer complaints, returned items, and potential unfair or deceptive practices. *Banks that do not have the appropriate controls to address the risks in these relationships may be viewed as facilitating a processor's*

26

*or its merchant client's fraud or other unlawful activity*. (Emphasis added)

70.     The guidance reminded banks that they:

 . . . must implement a due diligence and underwriting policy that, among other things, requires an initial background check of the processor and its underlying merchants to support the validity of the processor's and merchants' businesses, their creditworthiness, and business practices.

\*\*\*

By implementing the appropriate controls over processors and their merchant clients, a bank should be able to identify those processors that process for fraudulent telemarketers or other unscrupulous merchants and to ensure that the bank is not facilitating these transactions. In the event a bank identifies fraudulent or other improper activity with a processor or a specific merchant client of the processor, the bank should take immediate steps to address the problem, including filing a Suspicious Activity Report when appropriate, terminating the bank's relationship with the processor, or requiring the processor to cease processing for that specific merchant.

71.     The guidance concludes that:

The OCC supports national banks' participation in payment systems to serve the needs of legitimate processors and the customers of such processors and to diversify sources of revenue. However, to limit potential risk to banks and consumers, banks should ensure implementation of risk management programs that include appropriate oversight and controls commensurate with the risk and complexity of the activities. At a minimum, bank programs should verify the legitimacy of

the processor's business operations, assess the bank's risk
level, and monitor processor relationships for activity
indicative of fraud.

### Defendants Knew the Out-Of-State Payday Lenders
### Were Engaged In Unlawful Activities

72.     At the time Defendants originated the entries on the ACH Network

referenced herein, they knew the identity of the Out-Of-State Payday Lenders, they

knew the lenders were engaged in the business of making payday loans, and they

knew the Out-Of-State Payday Lenders were engaged in the business of making

payday loans in states where payday lending was unlawful.

73.     Characteristics of Out-Of-State Payday Lender transactions

themselves also notified ODFIs of unlawful activity.

74.     Whether ODFIs contract with Out-Of-State Payday Lenders or their

Third-Party Senders, ACH debits originated at the request of Out-Of-State Payday

Lenders inevitably raise "red flags" to ODFIs which alert them to the fact that

potential unlawful activity is occurring.

75.     Chief among these "red flags" are high return rates on ACH debit

transactions.  An ACH debit transaction may be returned for numerous reasons

including, *inter alia¸* the account to be debited having insufficient funds or the

account owner claiming the debit was not authorized.

28

76.     ACH debits originated at the request of the Out-Of-State Payday Lenders far exceed the return rate for all electronic payments of less than 1%.

## FACTS AS TO PLAINTIFF JESSICA PARM

77.     On or about December 7, 2011, Plaintiff Parm applied for and received a payday loan in the amount of $800.00 from Plain Green, LLC by completing an application on the **www.plaingreenloans.com** website.  As part of the application process, Plaintiff Parm authorized Plain Green, LLC to debit her checking account with Bank of America in order to repay the loan.

78.     The finance charge on the loan was $1,693.97.  The entirety of the interest plus principal, which equaled $2,493.97, was scheduled to be paid over the course of 9 months.

79.     Thus, the nominal annual interest rate on the loan was 354.20% ,with a monthly interest rate of 29.52%.

80.     On or about January 13, 2012, Plain Green initiated a debit transaction of $277.09 from Plaintiff Parm's checking account in Georgia through the ACH Network.  The $277.09 payment was applied solely to interest and did not reduce the amount of Plaintiff Parm's $800.00 debt.  The ODFI originating this transaction was NABC.

81.    On or about August 4, 2012, Plaintiff Parm applied for and received another payday loan in the amount of $250.00 from Plain Green by completing an application on the **www.plaingreenloans.com** website.  As part of the application process, Plaintiff Parm authorized Plain Green to debit her checking account with Bank of America in order to repay the loan.

82.    The finance charge on the loan was $340.58.  The entirety of the interest plus principal, which equaled $590.58, was scheduled to be paid over the course of 6 months.

83.    Thus, the nominal annual interest rate on the loan was 382.68%, with a monthly interest rate of 31.89%.

84.    On or about September 7, 2012, Plain Green initiated a debit transaction of $98.42 for Plaintiff Parm's checking account in Georgia through the ACH Network.  Of this amount, $80.69, the majority, was applied to interest and only $17.73 was applied toward the amount of Plaintiff Parm's $250.00 debt.  The ODFI originating this transaction was NABC.

85.    On or about December 5, 2012, Plaintiff Parm applied for and received a payday loan in the amount of $1,000.00 from Plain Green by completing an application on the **www.plaingreenloans.com** website.  As part of

the application process, Plaintiff Parm authorized Plain Green, LLC to debit her checking account with Bank of America in order to repay the loan.

86.     The finance charge on the loan was $2,329.91.  The entirety of the interest plus principal, which equaled $3,329.91, was scheduled to be paid over the course of 12 months.

87.     Thus, the nominal annual interest rate on the loan was 294.63%, with a monthly interest rate of 24.56%.

88.     On or about January 11, 2013, Plain Green initiated a debit transaction of $304.10 for Plaintiff Parm's checking account in Georgia through the ACH Network.  The $304.10 payment was applied solely to interest and did not reduce the amount of Plaintiff Parm's $1,000.00 debt.  The ODFI originating this transaction was NABC.

89.     On or about August 22, 2013, Plaintiff Parm applied for and received a payday loan in the amount of $325.00 from Red Rock by completing an application on the **www.castlepayday.com** website.  As part of the application process, Plaintiff Parm authorized Red Rock to debit her checking account with Bank of America in order to repay the loan.

90.     The finance charge on the loan was $1,802.49.  The entirety of the interest plus principal, which equaled $2,127.49, was scheduled to be paid over the course of 11 months.

91.     Thus, the nominal annual interest rate on the loan was 1,378%, with a monthly interest rate of 114.83%.

92.     On or about July 19, 2013, Red Rock initiated a debit transaction of $252.49 for Plaintiff Parm's checking account in Georgia through the ACH Network.  The $252.49 payment was applied solely to interest and did not reduce the amount of Plaintiff Parm's $325.00 debt.  The ODFI originating this transaction was Four Oaks.

93.     On or about April 18, 2013, Plaintiff Parm applied for and received a payday loan in the amount of $1,500.00 from Western Sky by completing an application on the **www.cashcall.com** website.  As part of the application process, Plaintiff Parm authorized Western Sky to debit her checking account with Bank of America in order to repay the loan.

94.     The finance charge on the loan was $3,831.06.  The entirety of the interest plus principal, which equaled $4,831.06, was scheduled to be paid over the course of 25 months.

95.     Thus, the nominal annual interest rate on the loan was 233.71%, with a monthly interest rate of 19.48%.

96.     On or about May 1, 2013, Western Sky initiated a debit transaction of $74.50 for Plaintiff Parm's checking account in Georgia through the ACH Network.  The $74.50 payment was applied solely to interest and did not reduce the amount of Plaintiff Parm's $1,500.00 debt.  The ODFI originating this transaction was NBCal.

97.     On or about June 1, 2013, Western Sky initiated a debit transaction of $198.19 for Plaintiff Parm's checking account in Georgia through the ACH Network.  Of this amount, $186.25, the majority of the payment, was applied to interest and only $11.94 was applied toward the amount of Plaintiff Parm's $1,500.00 debt.  The ODFI originating this transaction was NBCal.

98.     On or about August 13, 2013, Plaintiff Parm applied for and received a payday loan in the amount of $1,000.00 from Great Plains by completing an application on the **www.greatplainslending.com** website.  As part of the application process, Plaintiff Parm authorized Great Plains to debit her checking account with Bank of America in order to repay the loan.

99.    The finance charge on the loan was $2,205.49.  The entirety of the interest plus principal, which equaled $3,205.49, was scheduled to be paid over the course of 11 months.

100.    Thus, the nominal annual interest rate on the loan was 342.95%, with a monthly interest rate of 31.08%.

101.    On or about September 6, 2013, Great Plains initiated a debit transaction of $267.11 for Plaintiff Parm's checking account in Georgia through the ACH Network.  Of this amount, $210.96, the majority of the payment, was applied to interest and only $56.15 was applied toward the amount of Plaintiff Parm's $1,000.00 debt. The ODFI originating this transaction was BMO.

102.    On or about June 28, 2013, Plaintiff Parm applied for and received a payday loan in the amount of $800.00 from BlueChip by completing an application on the **www.spotloan.com** website.  As part of the application process, Plaintiff Parm authorized BlueChip to debit her checking account with Bank of America in order to repay the loan.

103.    The finance charge on the loan was $1,444.17.  The entirety of the interest plus principal, which equaled $2,244.17, was scheduled to be paid over the course of 7 months.

104.   Thus, the nominal annual interest rate on the loan was 342.95%, with a monthly interest rate of 31.08%.

105.   On or about July 12, 2013, BlueChip initiated a debit transaction of $132.01 for Plaintiff Parm's checking account in Georgia through the ACH Network.  The $132.01 payment was applied solely to interest and did not reduce the amount of Plaintiff Parm's $800.00 debt   The ODFI originating this transaction was NBCal.

## FACTS AS TO PLAINTIFF LISA FLAGG

106.   On or about March 16, 2012, Plaintiff Flagg applied for and received a payday loan in the amount of $1,000 from Plain Green by completing an application on the **www.plaingreenloans.com** website.  As part of the application process, Plaintiff Flagg authorized Plain Green to debit her checking account with JPMorgan Chase Bank, N.A. in order to pay the loan.

107.   On or about the following dates, Plain Green initiated debit transactions from Plaintiff Flagg's checking account in Georgia through the ACH Network:

    a.    March 30, 2012, Plain Green initiated a debit transaction of $115.78;

35

b.    April 13, 2012, Plain Green initiated a debit transaction of $115.78;

c.    April 27, 2012, Plain Green initiated a debit transaction of $155.78;

d.    May 11, 2012, Plain Green initiated a debit transaction of $115.78;

e.    May 25, 2012, Plain Green initiated a debit transaction of $155.78;

f.    June 8, 2012, Plain Green initiated a debit transaction of $185.78;

g.    June 22, 2012, Plain Green initiated a debit transaction of $115.78;

h.    July 13, 2012, Plain Green initiated a debit transaction of $115.78;

i.    July 27, 2012, Plain Green initiated a debit transaction of $115.78; and

j.    July 31, 2012, Plain Green initiated a debit transaction of $512.47.

108.   The ODFI originating each of these transactions was Defendant NABC.

109.   As a result, Plaintiff Flagg paid $1,704.49 in a period of approximately 14 weeks to satisfy a $1,000 loan.  Thus, the annual interest rate on the loan was at least 250%, with a monthly interest rate of at least 20.83%.

110.   On or about June 12, 2012, Plaintiff Flagg applied for and received a payday loan in the amount of $2,525.00 from Western Sky by completing an application on the **www.westernsky.com** website.  As part of the application process, Plaintiff Flagg authorized Plain Green to debit her checking account with JPMorgan Chase Bank, N.A. in order to pay the loan.

111.   On information and belief, amid mounting pressure from state and federal regulators, Western Sky either sold Plaintiff Flagg's debt to CashCall, or began collecting her debt through CashCall as an affiliated entity.  Plaintiff Flagg did not authorize CashCall to debit her checking account with JPMorgan Chase Bank, N.A.

112.   On information and belief, the finance charge on the Western Sky loan was $11,332.12.  The entirety of the interest plus principal, which equaled $13,859.12, was scheduled to be paid over the course of 46 months.

113.   Thus, the nominal annual interest rate on the loan was 139.02%, with a monthly interest rate of 11.585%.

114.   On or about the following dates, CashCall initiated debit transactions from Plaintiff Flagg's checking account in Georgia through the ACH Network:

  a.   July 6, 2012, CashCall initiated a debit transaction of $185.25;

  b.   August 17, 2012, CashCall initiated a debit transaction of $323.46;

  c.   October 19, 2012, CashCall initiated a debit transaction of $323.46;

  d.   November 16, 2012, CashCall initiated a debit transaction of;

  e.   December 14, 2012, CashCall initiated a debit transaction of;

  f.   February 2, 2013, CashCall initiated a debit transaction of $294.46;

  g.   March 15, 2013 CashCall initiated a debit transaction of $294.46;

  h.   April 15, 2013 CashCall initiated a debit transaction of $294.46;

  i.   May 24, 2013 CashCall initiated a debit transaction of $323.46; and

   j.  June 21, 2013 CashCall initiated a debit transaction of $323.46.

115. Plaintiff Flagg has and continues to make usurious interest payments on this outstanding loan.  The ODFI originating each of these transactions was Defendant NBCal.

116. On or about August 31, 2012, Plaintiff Flagg, over the telephone, applied for and received a payday loan in the amount of $250.00 from First National.  As part of the application process, Plaintiff Flagg authorized First National to debit her checking account with JPMorgan Chase Bank, N.A. in order to pay the loan.

117. On or about September 14, 2012, and October 12, 2012, First National initiated debit transactions in the amount of $335.00 for Plaintiff Flagg's checking account in Georgia through the ACH Network.  The ODFI originating each of these transactions was Defendant First Premier.

118. As a result, Plaintiff Flagg paid $670 in a period of approximately 6 weeks to satisfy a $250.00 loan.  Thus, the annual interest rate on the loan was approximately 1400%, with a monthly interest rate of approximately 115.67%.

119. On or about April 1, 2013, Plaintiff Flagg applied for and received a payday loan in the amount of $800.00 from BlueChip by completing an application on the **www.spotloan.com** website.  As part of the application process, Plaintiff

Flagg authorized BlueChip to debit her checking account with JPMorgan Chase Bank, N.A. in order to pay the loan.

120.   On or about the following dates, BlueChip initiated debit transactions from Plaintiff Flagg's checking account in Georgia through the ACH Network:

  a.   April 12, 2013, BlueChip initiated a debit transaction of $141.92;

  b.   April 26, 2013, BlueChip initiated a debit transaction of $141.92;

  c.   May 10, 2013, BlueChip initiated a debit transaction of $41.92;

  d.   June 7, 2013, BlueChip initiated a debit transaction of $141.92;

  e.   June 21, 2013, BlueChip initiated a debit transaction of $141.926;

  f.   July 5, 2013, BlueChip initiated a debit transaction of $141.92; and

  g.   July 19, 2013, BlueChip initiated a debit transaction of $141.92.

121.   On information and belief, the annual interest rate on the loan is at least 200%, with a monthly interest rate of at least 16.67%.  Plaintiff Flagg has and continues to make usurious interest payments on this outstanding loan.

122.   The ODFI originating each of these transactions was Defendant NBCal.

123.   Defendants BMO, Four Oaks, NBCal, NABC, and First Premier derived a benefit through the receipt of fees for their origination of debit entries on the ACH Network initiated by Plain Green, Red Rock, Western Sky, Great Plains, Blue Chip, CashCall, and First National (or Third-Party Senders acting on their behalf) and received by Plaintiffs.

## CLASS ACTION ALLEGATIONS

124.   Description of the Class and Sub-Class:  Plaintiffs bring this class action on behalf of themselves and a Class and Sub-Class defined as follows:

i.    All natural persons within the states of Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia whose accounts were debited via an ACH entry originated by either BMO Harris Bank, N.A., Four Oaks Bank & Trust Co., National Bank of California, North American Banking Co., or First Premier Bank as an ODFI on behalf of an Out-Of-State Payday Lender in repayment of a loan which was illegal under the law of their respective state at the time of the debit (the "Class").

ii.   All natural persons within the state of Georgia whose accounts were debited via an ACH entry originated by either BMO Harris Bank, N.A., Four Oaks Bank & Trust Co., National Bank of California, North

American Banking Co., or First Premier Bank as an
ODFI on behalf of an Out-Of-State Payday Lender in
repayment of a loan which was illegal under Georgia
law (the "Sub-Class").

125.   Excluded from the Class and Sub-Class are Defendant's officers,

directors, affiliates, legal representatives, employees, successors, subsidiaries, and

assigns.  Also excluded from the Class and Sub-Class is any judge, justice or

judicial officer presiding over this matter and the members of their immediate

families and judicial staff.

126.   Numerosity:  The proposed Class and Sub-Class are so numerous that

individual joinder of all members is impracticable.

127.   Common Questions of Law and Fact Predominate:  There are many

questions of law and fact common to Plaintiffs and the Class and Sub-Class, and

those questions substantially predominate over any questions that may affect

individual Class and Sub-Class members.  Common questions of fact and law

include (a) whether payday loans are usurious and unenforceable under state or

federal law; (b) whether debts owed to payday lenders are incurred in connection

with the business of lending money at an usurious rate; (c) whether the usurious

rate was at least twice the enforceable rate under the law of the states in which

class members reside; (d) whether Defendants' collection of the illegal or

unenforceable debt was made with actual or constructive knowledge of the

illegality of the loans; (e) whether Defendants' collection of the illegal debt was the proximate cause of the Class and Sub-Class's injuries; (f) whether the Class and Sub-Class suffered an injury to property by the debiting of their accounts by Defendants; and (g) should the running of the statute of limitations for the Class and Sub-Class's claims be equitably tolled.

128.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the members of the Class and Sub-Class.  Plaintiffs and all members of the Class and Sub-Class have been similarly affected by the actions of BMO, Four Oaks, NBCal, NABC, and First Premier.

129.   <u>Adequacy of Representation</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Class and Sub-Class.  Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and Sub-Class, and have the financial resources to do so.

130.   <u>Superiority of Class Action</u>:  Plaintiffs and the members of the Class and Sub-Class suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.

Individual joinder of all members of the Class and Sub-Class is impractical.  Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

<u>**FIRST CLAIM FOR RELIEF**</u>
<u>**Violation of 18 U.S.C. § 1962(c) by BMO**</u>
<u>**(On behalf of the Class and Sub-Class)**</u>

131.  Plaintiffs incorporate by reference the preceding paragraphs.

132.  BMO is a "person" as defined by 18 U.S.C. § 1961(3).

133.  The ACH Network is comprised of  the following participants:

    a.    "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.    "ODFIs" which include all participating financial institutions that originate ACH entries at the request of and by ODFI agreement with its customers and agree to abide by the NACHA Operating Rules, including BMO;

c.    "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.    "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.    "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.    "Third-Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement

with the Originator, and the ODFI's ACH agreement is with the

Third-Party Sender and not the Originator.

134.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. §

1961(4) as an association of multiple legal entities operating under NACHA.

Alternatively, participants in the ACH Network constitute an "association-in-fact"

enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**)

in that:

    a.    Participants in the ACH Enterprise share a common purpose of

facilitating large volume batch processing of electronic

payments (credit and debit transactions) for and between

participating depository financial institutions;

    b.    To achieve this common purpose, participants in the ACH

Enterprise preserve close business relationships and maintain

established and defined roles within the enterprise;

    c.    The ACH Enterprise has been in existence for many years, is

still ongoing, and has longevity sufficient to permit the

participants to achieve their common purpose.

135.   The ACH Enterprise is an enterprise engaged in, and whose activities,

including daily volume batch processing of electronic payments across the United

46

States, affect interstate commerce.  BMO is associated with the ACH Enterprise

through its role as an ODFI within the ACH Enterprise.

136.   BMO, as an ODFI, plays a distinct role in the operation, management,

and control of the ACH Enterprise.  Under the NACHA Operating Rules, BMO

serves the critical function of "gatekeeper of the ACH Network" and is responsible

for all entries originated through BMO, whether initiated by an Originator, or by a

Third-Party Service Provider acting on the Originator's behalf.

137.   In order to initiate debit entries from consumer checking accounts on

the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on

their behalf, must enter into an Origination Agreement with an ODFI, such as

BMO, and the ODFI must originate the ACH debit.  Pursuant to NACHA

Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is

warranting to each RDFI and ACH Operator that the entry has been properly

authorized meaning that it is, *inter alia*, compliant with the NACHA Operating

Rules and state and federal laws.

138.   BMO has used its role within the ACH Enterprise to conduct and

participate in the collection of unlawful payday loans by originating entries on the

ACH Network at the request of Out-Of State Payday Lenders or Third-party

Senders acting on their behalf which debit the accounts of persons residing in

states in which payday lending is illegal.  Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable because of state or federal laws against usury;

    b.    incurred in connection with the business of lending money at an usurious rate; and

    c.    the usurious rate was at least twice the enforceable rate.

139.   BMO, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that BMO knew routinely violate state law; and originated debit entries that BMO knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

140.   Pursuant to the fraudulent scheme, BMO participated in the collection of unlawful debts in that:

    a.    Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.    BMO then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

48

     c.     BMO knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

141.   Accordingly, BMO has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

142.   As a direct and proximate result of BMO's violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

## SECOND CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by BMO
### (On behalf of the Class and Sub-Class)

143.   Plaintiffs incorporate by reference the preceding paragraphs.

144.   BMO and Out-Of-State Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.    unenforceable because of state or federal laws against usury;

      b.    incurred in connection with the business of lending money at an usurious rate; and

      c.    the usurious rate was at least twice the enforceable rate.

145.   In furtherance of their agreement, BMO and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

      a.    Out-Of-State Payday Lenders (or Third-Party Senders acting on behalf of the Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.  BMO agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.  BMO knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

146.  Accordingly, BMO intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

147.  As a direct and proximate result of BMO and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and the members of the Class and

Sub-Class were injured in their property by the debiting of their bank accounts by

BMO and such injury was reasonably foreseeable.

### THIRD CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) by Four Oaks
### (On behalf of the Class and Sub-Class)

148.   Plaintiffs incorporate by reference the preceding paragraphs.

149.   Four Oaks is a "person" as defined by 18 U.S.C. § 1961(3).

150.   The ACH Network is comprised of  the following participants:

     a.   "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

     b.   "ODFIs" which include all participating financial institutions that originate ACH entries at the request of and by ODFI agreement with its customers and agree to abide by the NACHA Operating Rules, including Four Oaks;

     c.   "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.   "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.   "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.   "Third-Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

151.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

a.     Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b.     To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c.     The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

152.   The ACH Enterprise is an enterprise engaged in, and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  Four Oaks is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

153.   Four Oaks, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, Four Oaks serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through Four Oaks, whether initiated by

an Originator, or by a Third-Party Service Provider acting on the Originator's behalf.

154.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as Four Oaks, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

155.   Four Oaks has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful payday loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders or Third-party Senders acting on their behalf which debit the accounts of persons residing in states in which payday lending is illegal.  Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

  a.   unenforceable because of state or federal laws against usury;

  b.   incurred in connection with the business of lending money at an usurious rate; and

      c.     the usurious rate was at least twice the enforceable rate.

156.   Four Oaks, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that Four Oaks knew routinely violate state law; and originated debit entries that Four Oaks knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

157.   Pursuant to the fraudulent scheme, Four Oaks participated in the collection of unlawful debts in that:

      a.     Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

      b.     Four Oaks then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

      c.     Four Oaks knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North

Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the

District of Columbia and still originated ACH debit entries into

those states at the request of the Out-Of-State Payday Lenders

in violation of 18 U.S.C. §1962(c).

158.   Accordingly, Four Oaks has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

159.   As a direct and proximate result of Four Oaks violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by Four Oaks and such injury was reasonably foreseeable.

## FOURTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by Four Oaks
### (On behalf of the Class and Sub-Class)

160.   Plaintiffs incorporate by reference the preceding paragraphs.

161.   Four Oaks and Out-Of-State Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their

endeavor, if completed, would constitute the collection of "unlawful debts" under
18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable because of state or federal laws against usury;

    b.    incurred in connection with the business of lending money at an usurious rate; and

    c.    the usurious rate was at least twice the enforceable rate.

162.   In furtherance of their agreement, Four Oaks and Out-Of-State Payday
Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

    a.    Out-Of-State Payday Lenders (or Third-Party Senders acting on behalf of the Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.    Four Oaks agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

    c.    Four Oaks knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia,

58

Maryland, Massachusetts, New Jersey, New York, North

Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the

District of Columbia and still originated ACH debit entries into

those states at the request of the Out-Of-State Payday Lenders

in violation of 18 U.S.C. §1962(c).

163.   Accordingly, Four Oaks intentionally conspired and agreed to directly

and indirectly conduct and participate in the conduct of the affairs of the ACH

Enterprise through the collection of unlawful debts in violation of 18 U.S.C. §

1962(c).

164.   As a direct and proximate result of Four Oaks and Out-Of-State

Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy,

and violations of 18 U.S.C. § 1962(d), Plaintiffs and the members of the Class and

Sub-Class were injured in their property by the debiting of their bank accounts by

Four Oaks and such injury was reasonably foreseeable.

## FIFTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) by NBCal
### (On behalf of the Class and Sub-Class)

165.   Plaintiffs incorporate by reference the preceding paragraphs.

166.   NBCal is a "person" as defined by 18 U.S.C. § 1961(3).

167.   The ACH Network is comprised of  the following participants:

a.  "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.  "ODFIs" which include all participating financial institutions that originate ACH entries at the request of and by ODFI agreement with its customers and agree to abide by the NACHA Operating Rules, including NBCal;

c.  "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.  "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.  "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.  "Third-Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function

on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

168.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

    a.    Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

    b.    To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c.   The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

169.   The ACH Enterprise is an enterprise engaged in, and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  NBCal is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

170.   NBCal, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, NBCal serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through NBCal, whether initiated by an Originator, or by a Third-Party Service Provider acting on the Originator's behalf.

171.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as NBCal, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly

authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

172.   NBCal has used its role within ACH Enterprise to conduct and participate in the collection of unlawful payday loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders or Third-party Senders acting on their behalf which debit the accounts of persons residing in states in which payday lending is illegal.  Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

   a.   unenforceable because of state or federal laws against usury;

   b.   incurred in connection with the business of lending money at an usurious rate; and

   c.   the usurious rate was at least twice the enforceable rate.

173.   NBCal, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that NBCal knew routinely violate state law; and originated debit entries that NBCal knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

174.   Pursuant to the fraudulent scheme, NBCal participated in the collection of unlawful debts in that:

a.   Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.   NBCal then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.   NBCal knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

175.   Accordingly, NBCal has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

176.   As a direct and proximate result of NBCal's violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class and Sub-Class were injured in

their property by the debiting of their bank accounts by NBCal and such injury was reasonably foreseeable.

## SIXTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by NBCal
### (On behalf of the Class and Sub-Class)

177.   Plaintiffs incorporate by reference the preceding paragraphs.

178.   NBCal and Out-Of-State Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

a.   unenforceable because of state or federal laws against usury;

b.   incurred in connection with the business of lending money at an usurious rate; and

c.   the usurious rate was at least twice the enforceable rate.

179.   In furtherance of their agreement, NBCal and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

a.   Out-Of-State Payday Lenders (or Third-Party Senders acting on behalf of the Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.   NBCal agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.   NBCal knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

180.   Accordingly, NBCal intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH

Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

181.   As a direct and proximate result of NBCal and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by NBCal and such injury was reasonably foreseeable.

**SEVENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by NABC**
**(On behalf of the Class and Sub-Class)**

182.   Plaintiffs incorporate by reference the preceding paragraphs.

183.   NABC is a "person" as defined by 18 U.S.C. § 1961(3).

184.   The ACH Network is comprised of the following participants:

a.   "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.   "ODFIs" which include all participating financial institutions that originate ACH entries at the request of and by ODFI agreement with its customers and agree to abide by the NACHA Operating Rules, including NABC;

67

c.     "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.     "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.     "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.     "Third-Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

185.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA.

Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

    a.    Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

    b.    To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

    c.    The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

186.   The ACH Enterprise is an enterprise engaged in, and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  NABC is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

187.   NABC, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating

Rules, NABC serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through NABC, whether initiated by an Originator, or by a Third-Party Service Provider acting on the Originator's behalf.

188.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as NABC, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

189.   NABC has used its role within ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-Of State Payday Lenders or Third-party Senders acting on their behalf which debit the accounts of persons residing in states in which payday lending is illegal.  Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

> a.    unenforceable because of state or federal laws against usury;

      b.      incurred in connection with the business of lending money at an usurious rate; and

      c.      the usurious rate was at least twice the enforceable rate.

190.   NABC, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that NABC knew routinely violate state law; and originated debit entries that NABC knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

191.   Pursuant to the fraudulent scheme, NABC participated in the collection of unlawful debts in that:

      a.      Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

      b.      NABC then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

      c.      NABC knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia,

Maryland, Massachusetts, New Jersey, New York, North

Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the

District of Columbia and still originated ACH debit entries into

those states at the request of the Out-Of-State Payday Lenders

in violation of 18 U.S.C. §1962(c).

192.   Accordingly, NABC has directly and indirectly conducted and

participated in the conduct of the affairs of the ACH Enterprise through the

collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

193.   As a direct and proximate result of NABC's violations of 18 U.S.C. §

1962(c), Plaintiffs and the members of the Class and Sub-Class were injured in

their property by the debiting of their bank accounts by NABC and such injury was

reasonably foreseeable.

## EIGHTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by NABC
### (On behalf of the Class and Sub-Class)

194.   Plaintiffs incorporate by reference the preceding paragraphs.

195.   NABC and Out-Of-State Lenders, or Third-Party Senders acting on

their behalf, reached an agreement to use their respective roles within the ACH

Enterprise to facilitate payday loans to consumers residing in states that banned the

practice and collect usurious interest rates in violation of state law.  Their

endeavor, if completed, would constitute the collection of "unlawful debts" under

18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable because of state or federal laws against usury;

    b.    incurred in connection with the business of lending money at an usurious rate; and

    c.    the usurious rate was at least twice the enforceable rate.

196.    In furtherance of their agreement, NABC and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

    a.    Out-Of-State Payday Lenders (or Third-Party Senders acting on behalf of the Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.    NABC agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

    c.    NABC knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia,

Maryland, Massachusetts, New Jersey, New York, North

Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the

District of Columbia and still originated ACH debit entries into

those states at the request of the Out-Of-State Payday Lenders

in violation of 18 U.S.C. §1962(c).

197.   Accordingly, NABC intentionally conspired and agreed to directly

and indirectly conduct and participate in the conduct of the affairs of the ACH

Enterprise through the collection of unlawful debts in violation of 18 U.S.C. §

1962(c).

198.   As a direct and proximate result of NABC and Out-Of-State Payday

Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and

violations of 18 U.S.C. § 1962(d), Plaintiffs and the members of the Class and

Sub-Class were injured in their property by the debiting of their bank accounts by

NABC and such injury was reasonably foreseeable.

### <u>NINTH CLAIM FOR RELIEF</u>
### <u>Violation of 18 U.S.C. § 1962(c) by First Premier</u><br><u>(On behalf of the Class and Sub-Class)</u>

199.   Plaintiffs incorporate by reference the preceding paragraphs.

200.   First Premier is a "person" as defined by 18 U.S.C. § 1961(3).

201.   The ACH Network is comprised of  the following participants:

a.   "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.   "ODFIs" which include all participating financial institutions that originate ACH entries at the request of and by ODFI agreement with its customers and agree to abide by the NACHA Operating Rules, including First Premier;

c.   "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.   "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.   "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.   "Third-Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function

on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

202. The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

    a.    Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

    b.    To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

     c.     The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

203.   The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  First Premier is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

204.   First Premier, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, First Premier serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through First Premier, whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

205.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as First Premier, and the ODFI must originate the ACH debit.   Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly

authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

206.  First Premier has used its role within ACH Enterprise to conduct and participate in the collection of unlawful payday loans originating entries on the ACH Network at the request of Out-Of State Payday Lenders or Third-party Senders acting on their behalf which debit the accounts of persons residing in states in which payday lending is illegal.  Said loans are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.     unenforceable because of state or federal laws against usury;

      b.     incurred in connection with the business of lending money at an usurious rate; and

      c.     the usurious rate was at least twice the enforceable rate.

207.  First Premier, in its role as an ODFI in the ACH Enterprise, originated debit entries initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that First Premier knew routinely violate state law; and originated debit entries that First Premier knew were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

208.  Pursuant to the fraudulent scheme, First Premier engaged in the collection of unlawful debts in that:

a.   Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.   First Premier then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.   First Premier knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

209.   Accordingly, First Premier has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

210.   As a direct and proximate result of First Premier's violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class and Sub-Class were

injured in their property by the debiting of their bank accounts by First Premier and such injury was reasonably foreseeable.

## TENTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by First Premier
### (On behalf of Class and Sub-Class)

211.   Plaintiffs incorporate by reference the preceding paragraphs.

212.   First Premier and Out-Of-State Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

   a.   unenforceable because of state or federal laws against usury;

   b.   incurred in connection with the business of lending money at an usurious rate; and

   c.   the usurious rate was at least twice the enforceable rate.

213.   In furtherance of their agreement, First Premier and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

a.    Out-Of-State Payday Lenders (or Third-Party Senders acting on behalf of the Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.    First Premier agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.    First Premier knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

214.   Accordingly, First Premier intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the

ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C.

§ 1962(c).

215.   As a direct and proximate result of First Premier and Out-Of-State

Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy,

and violations of 18 U.S.C. § 1962(d), Plaintiffs and the members of the Class and

Sub-Class were injured in their property by the debiting of their bank accounts by

First Premier and such injury was reasonably foreseeable.

## ELEVENTH CLAIM FOR RELIEF
### Violation of O.C.G.A. §16-14-4(a) and (b) by BMO
### (On behalf of the Sub-Class)

216.   Plaintiffs incorporate by reference the preceding paragraphs.

217.   This claim is brought under Georgia's Racketeer Influenced Corrupt

Organizations statute, O.C.G.A. § 16-14-1, *et. seq*., seeking to stop and deter BMO

from practicing its unlawful enterprise, conducted through a pattern of racketeering

activity, upon Georgia consumers and to provide an adequate remedy for the

victims of such practices.

218.   As set forth more fully above, in the course of making payday loans to

consumers in Georgia, BMO repeatedly and knowingly takes or receives monies

that equate to interest in excess of that allowed by law.  Such rates compute to

annual percentage rates of at least 231.71% and up to 1,378%.

219.   The ACH Network is comprised of the following participants:

    a.    "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

    b.    "ODFIs" which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including BMO;

    c.    "RDFIs" which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

    d.    "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

    e.    "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

      f.     "Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

220.   The ACH Network constitutes an "enterprise" pursuant to O.C.G.A. §16-14-3(6) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in O.C.G.A.§16-14-3(6) (**the "ACH Enterprise"**) in that:

      a.     Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

      b.     To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c.    The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

221.   The ACH enterprise collects usurious interest rates on illegal and predatory loans to Georgia consumers.  BMO is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

222.   BMO, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, BMO serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through BMO, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

223.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as BMO, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, among other things, compliant with Georgia state law.

224.   The Out-Of-State Payday Lenders extend loans for amounts of $3,000 or less that charge unconscionable and usurious rates of interest.  The collection of illegal amounts of interest forms the object of this enterprise and pattern of racketeering activity.

225.   BMO has used its role within the ACH Enterprise to conduct and participate in the collection of usurious loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders (or Third-party Senders acting on their behalf) which debit the accounts of persons residing in Georgia.

226.   BMO, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that BMO knew were usurious under Georgia law; and originated debit entries that BMO knew were usurious under Georgia law.

227.   BMO's unlawful scheme constitutes an enterprise executed through a pattern of racketeering activity that included multiple and repeated criminal acts, including numerous acts of usury and theft by taking, deception and conversion, all defined as predicate acts by Georgia law.

228.   The Georgia General Assembly expressly amended the Georgia RICO statute by adding usury as a predicate act for the express purpose of combating this kind of illegal payday loan activity, O.C.G.A. §16-14-3(9)(A)(xxxviii).

229.   Pursuant to the fraudulent scheme, BMO participated in the collection of usurious debts in that:

    a.   Out-Of-State Payday Lenders initiated the transactions whereby Georgia borrowers' bank accounts were debited and the usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

    b.   BMO then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

    c.   BMO knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Georgia, and still originated ACH debit entries into the state at the request of the Out-Of-State Payday Lenders in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

230.   BMO's pattern of racketeering activity shares a common target or victim: Georgia consumers, like Plaintiffs and the Class.

231.   As a direct and proximate result of this unlawful scheme, Plaintiffs and the Class suffered damages including but not limited to amounts paid for usurious interest.

## TWELFTH CLAIM FOR RELIEF
### Conspiracy to Commit Violations of O.C.G.A. §16-14-4(c) by BMO
### (On behalf of the Sub-Class)

232.   Plaintiffs incorporate by reference the preceding paragraphs.

233.   This claim is brought under Georgia's Racketeer Influenced Corrupt Organizations statute, O.C.G.A. § 16-14-1, *et. seq.*, seeking to stop and deter BMO from conspiring to practice in Defendants' unlawful enterprise, conducted through a pattern of racketeering activity, upon Georgia consumers and to provide an adequate remedy for the victims of such practices.

234.   As set forth more fully above, BMO and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to citizens of Georgia and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would violate O.C.G.A. §16-14-3(9)(A)(xxxviii).

235.   In furtherance of their conspiracy BMO and the Out-Of-State Payday Lenders agreed to take certain stapes to facilitate the collection of illegal and usurious payday loans in Georgia:

a.  Out-Of-State Payday Lenders initiated the transactions whereby Georgia borrowers' bank accounts were debited and the usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

b.  BMO then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

c.  BMO knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Georgia, and still originated ACH debit entries into the state at the request of the Out-Of-State Payday Lenders in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

236.  BMO's participation in a conspiracy with the other Defendants to engage in a pattern of racketeering activity shares a common target or victim: Georgia consumers, like Plaintiffs and the Class.

237.  As a direct and proximate result of this conspiracy Plaintiffs and the Class suffered damages including but not limited to amounts paid for usurious interest.

### THIRTEENTH CLAIM FOR RELIEF

**Violation of O.C.G.A. §16-14-4(a) and (b) by Four Oaks**
**(On behalf of the Sub-Class)**

238.   Plaintiffs incorporate by reference the preceding paragraphs.

239.   This claim is brought under Georgia's Racketeer Influenced Corrupt Organizations statute, O.C.G.A. § 16-14-1, *et. seq.*, seeking to stop and deter Four Oaks from practicing its unlawful enterprise, conducted through a pattern of racketeering activity, upon Georgia consumers and to provide an adequate remedy for the victims of such practices.

240.   As set forth more fully above, in the course of making payday loans to consumers in Georgia, Four Oaks repeatedly and knowingly takes or receives monies that equate to interest in excess of that allowed by law.  Such rates compute to annual percentage rates of at least 231.71% and up to 1,378%.

241.    The ACH Network is comprised of  the following participants:

      a.      "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

      b.      "ODFIs" which include all participating financial institutions that originate ACH entries at the request of an Originator or

Third Party Service Provider and agree to abide by the NACHA Operating Rules, including Four Oaks;

c.      "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.      "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.      "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.      "Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

242.   The ACH Network constitutes an "enterprise" pursuant to O.C.G.A.§16-14-3(6) as an association of multiple legal entities operating under NACHA.  Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in O.C.G.A.§16-14-3(6) (**the "ACH Enterprise"**) in that:

> a.   Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

> b.   To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

> c.   The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

243.   The ACH enterprise collects usurious interest rates on illegal and predatory loans to Georgia consumers.  Four Oaks is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

244.   Four Oaks, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, Four Oaks serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through Four Oaks, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

245.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as Four Oaks, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, among other things, compliant with Georgia state law.

246.   The Out-Of-State Payday Lenders extend loans for amounts of $3,000 or less that charge unconscionable and usurious rates of interest.  The collection of illegal amounts of interest forms the object of this enterprise and pattern of racketeering activity.

247.   Four Oaks has used its role within the ACH Enterprise to conduct and participate in the collection of usurious loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders (or Third-party Senders acting on their behalf) which debit the accounts of persons residing in Georgia.

248.   Four Oaks, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that Four Oaks knew were usurious under Georgia law; and originated debit entries that Four Oaks knew were usurious under Georgia law.

249.   Four Oaks' unlawful scheme constitutes an enterprise executed through a pattern of racketeering activity that included multiple and repeated criminal acts, including numerous acts of usury and theft by taking, deception and conversion, all defined as predicate acts by Georgia law.

250.   The Georgia General Assembly expressly amended the Georgia RICO statute by adding usury as a predicate act for the express purpose of combating this kind of illegal payday loan activity, O.C.G.A. §16-14-3(9)(A)(xxxviii).

251.   Pursuant to the fraudulent scheme, Four Oaks participated in the collection of usurious debts in that:

a. Out-Of-State Payday Lenders initiated the transactions whereby Georgia borrowers' bank accounts were debited and the usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

b. Four Oaks then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

c. Four Oaks knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Georgia, and still originated ACH debit entries into the state at the request of the Out-Of-State Payday Lenders in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

252.   Four Oaks' pattern of racketeering activity shares a common target or victim: Georgia consumers, like Plaintiffs and the Class.

253.   As a direct and proximate result of this unlawful scheme, Plaintiffs and the Class suffered damages including but not limited to amounts paid for usurious interest.

## FOURTEENTH CLAIM FOR RELIEF

### Conspiracy to Commit Violations of O.C.G.A. §16-14-4(c) by Four Oaks
### (On behalf of the Sub-Class)

254.    Plaintiffs incorporate by reference the preceding paragraphs.

255.    This claim is brought under Georgia's Racketeer Influenced Corrupt Organizations statute, O.C.G.A. § 16-14-1, *et. seq.*, seeking to stop and deter Four Oaks from conspiring to practice in Defendants' unlawful enterprise, conducted through a pattern of racketeering activity, upon Georgia consumers and to provide an adequate remedy for the victims of such practices.

256.    As set forth more fully above, Four Oaks and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to citizens of Georgia and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would violate O.C.G.A. §16-14-3(9)(A)(xxxviii).

257.    In furtherance of their conspiracy Four Oaks and the Out-Of-State Payday Lenders agreed to take certain stapes to facilitate the collection of illegal and usurious payday loans in Georgia:

       a.    Out-Of-State Payday Lenders initiated the transactions whereby

             Georgia borrowers' bank accounts were debited and the

usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

b.    Four Oaks then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

c.    Four Oaks knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Georgia, and still originated ACH debit entries into the state at the request of the Out-Of-State Payday Lenders in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

258.   Four Oaks' participation in a conspiracy with the other Defendants to engage in a pattern of racketeering activity shares a common target or victim: Georgia consumers, like Plaintiffs and the Class.

259.   As a direct and proximate result of this conspiracy Plaintiffs and the Class suffered damages including but not limited to amounts paid for usurious interest.

## FIFTEENTH CLAIM FOR RELIEF
### Violation of O.C.G.A. §16-14-4(a) and (b) by NBCal
### (On behalf of the Sub-Class)

260.   Plaintiffs incorporate by reference the preceding paragraphs.

261.   This claim is brought under Georgia's Racketeer Influenced Corrupt Organizations statute, O.C.G.A. § 16-14-1, *et. seq.*, seeking to stop and deter NBCal from practicing its unlawful enterprise, conducted through a pattern of racketeering activity, upon Georgia consumers and to provide an adequate remedy for the victims of such practices.

262.   As set forth more fully above, in the course of making payday loans to consumers in Georgia, NBCal repeatedly and knowingly takes or receives monies that equate to interest in excess of that allowed by law.  Such rates compute to annual percentage rates of at least 231.71% and up to 1,378%.

263.   The ACH Network is comprised of  the following participants:

    a.    "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

    b.    "ODFIs" which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including NBCal;

c.      "RDFIs" which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.      "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.      "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.      "Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

264.   The ACH Network constitutes an "enterprise" pursuant to O.C.G.A.§16-14-3(6) as an association of multiple legal entities operating under

NACHA.  Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in O.C.G.A.§16-14-3(6) (**the "ACH Enterprise"**) in that:

    a.    Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

    b.    To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

    c.    The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

265.   The ACH enterprise collects usurious interest rates on illegal and predatory loans to Georgia consumers.  NBCal is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

266.   NBCal, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, NBCal serves the critical function of "gatekeeper of the ACH Network" and

is responsible for all entries originated through NBCal, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

267.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as NBCal, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, among other things, compliant with Georgia state law.

268.   The Out-Of-State Payday Lenders extend loans for amounts of $3,000 or less that charge unconscionable and usurious rates of interest.  The collection of illegal amounts of interest forms the object of this enterprise and pattern of racketeering activity.

269.   NBCal has used its role within the ACH Enterprise to conduct and participate in the collection of usurious loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders (or Third-party Senders acting on their behalf) which debit the accounts of persons residing in Georgia.

270.   NBCal, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that NBCal knew were usurious under Georgia law; and originated debit entries that NBCal knew were usurious under Georgia law.

271.   NBCal's unlawful scheme constitutes an enterprise executed through a pattern of racketeering activity that included multiple and repeated criminal acts, including numerous acts of usury and theft by taking, deception and conversion, all defined as predicate acts by Georgia law.

272.   The Georgia General Assembly expressly amended the Georgia RICO statute by adding usury as a predicate act for the express purpose of combating this kind of illegal payday loan activity, O.C.G.A. §16-14-3(9)(A)(xxxviii).

273.   Pursuant to the fraudulent scheme, NBCal participated in the collection of usurious debts in that:

a.   Out-Of-State Payday Lenders initiated the transactions whereby Georgia borrowers' bank accounts were debited and the usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

b.   NBCal then originated ACH entries by which the accounts were

debited and the unlawful debts collected in violation of

O.C.G.A. §16-14-3(9)(A)(xxxviii);

c.   NBCal knew that the Out-Of-State Payday Lenders were

payday lenders and that payday loans were illegal and

unenforceable in Georgia, and still originated ACH debit entries

into the state at the request of the Out-Of-State Payday Lenders

in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

274.   NBCal's pattern of racketeering activity shares a common target or

victim: Georgia consumers, like Plaintiffs and the Class.

275.   As a direct and proximate result of this unlawful scheme, Plaintiffs

and the Class suffered damages including but not limited to amounts paid for

usurious interest.

## SIXTEENTH CLAIM FOR RELIEF
### Conspiracy to Commit Violations of O.C.G.A. §16-14-4(c) by NBCal
### (On behalf of the Sub-Class)

276.   Plaintiffs incorporate by reference the preceding paragraphs.

277.   This claim is brought under Georgia's Racketeer Influenced Corrupt

Organizations statute, O.C.G.A. § 16-14-1, *et. seq*., seeking to stop and deter

NBCal from conspiring to practice in Defendants' unlawful enterprise, conducted

through a pattern of racketeering activity, upon Georgia consumers and to provide an adequate remedy for the victims of such practices.

278.   As set forth more fully above, NBCal and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to citizens of Georgia and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would violate O.C.G.A. §16-14-3(9)(A)(xxxviii).

279.   In furtherance of their conspiracy NBCal and the Out-Of-State Payday Lenders agreed to take certain stapes to facilitate the collection of illegal and usurious payday loans in Georgia:

   a.   Out-Of-State Payday Lenders initiated the transactions whereby Georgia borrowers' bank accounts were debited and the usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

   b.   NBCal then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

   c.   NBCal knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and

unenforceable in Georgia, and still originated ACH debit entries

into the state at the request of the Out-Of-State Payday Lenders

in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

280.   NBCal's participation in a conspiracy with the other Defendants to

engage in a pattern of racketeering activity shares a common target or victim:

Georgia consumers, like Plaintiffs and the Class.

281.   As a direct and proximate result of this conspiracy Plaintiffs and the

Class suffered damages including but not limited to amounts paid for usurious

interest.

## SEVENTEENTH  CLAIM FOR RELIEF
### Violation of O.C.G.A. §16-14-4(a) and (b) by NABC
### (On behalf of the Sub-Class)

282.   Plaintiffs incorporate by reference the preceding paragraphs.

283.   This claim is brought under Georgia's Racketeer Influenced Corrupt

Organizations statute, O.C.G.A. § 16-14-1, *et. seq.*, seeking to stop and deter

NABC from practicing its unlawful enterprise, conducted through a pattern of

racketeering activity, upon Georgia consumers and to provide an adequate remedy

for the victims of such practices.

284.   As set forth more fully above, in the course of making payday loans to

consumers in Georgia, NABC repeatedly and knowingly takes or receives monies

that equate to interest in excess of that allowed by law.  Such rates compute to annual percentage rates of at least 231.71% and up to 1,378%.

285.   The ACH Network is comprised of  the following participants:

a.   "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.   "ODFIs" which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including NABC;

c.   "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.   "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.   "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network

(EPN), that process ACH transactions between financial

institutions; and

f.      "Third Party Service Providers" which include entities other

than the Originator, ODFI, or RDFI that perform any function

on behalf of the Originator, ODFI, or RDFI with respect to the

processing of ACH entries.   A "Third-Party Sender" is a type

of Third-Party Service Provider that has an ACH agreement

with the Originator, and the ODFI's ACH agreement is with the

Third-Party Sender and not the Originator.

286.   The ACH Network constitutes an "enterprise" pursuant to

O.C.G.A.§16-14-3(6) as an association of multiple legal entities operating under

NACHA.  Alternatively, participants in the ACH Network constitute an

"association-in-fact" enterprise as those terms are used in O.C.G.A.§16-14-3(6)

(**the "ACH Enterprise"**) in that:

a.      Participants in the ACH Enterprise share a common purpose of

facilitating large volume batch processing of electronic

payments (credit and debit transactions) for and between

participating depository financial institutions;

b.  To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c.  The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

287.  The ACH enterprise collects usurious interest rates on illegal and predatory loans to Georgia consumers.  NABC is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

288.  NABC, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, NABC serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through NABC, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

289.  In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as NABC, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is

warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, among other things, compliant with Georgia state law.

290.   The Out-Of-State Payday Lenders extend loans for amounts of $3,000 or less that charge unconscionable and usurious rates of interest.  The collection of illegal amounts of interest forms the object of this enterprise and pattern of racketeering activity.

291.   NABC has used its role within the ACH Enterprise to conduct and participate in the collection of usurious loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders (or Third-party Senders acting on their behalf) which debit the accounts of persons residing in Georgia.

292.   NABC, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that NABC knew were usurious under Georgia law; and originated debit entries that NABC knew were usurious under Georgia law.

293.   NABC's unlawful scheme constitutes an enterprise executed through a pattern of racketeering activity that included multiple and repeated criminal acts,

including numerous acts of usury and theft by taking, deception and conversion, all defined as predicate acts by Georgia law.

294.   The Georgia General Assembly expressly amended the Georgia RICO statute by adding usury as a predicate act for the express purpose of combating this kind of illegal payday loan activity, O.C.G.A. §16-14-3(9)(A)(xxxviii).

295.   Pursuant to the fraudulent scheme, NABC participated in the collection of usurious debts in that:

    a.    Out-Of-State Payday Lenders initiated the transactions whereby Georgia borrowers' bank accounts were debited and the usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

    b.    NABC then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

    c.    NABC knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Georgia, and still originated ACH debit entries into the state at the request of the Out-Of-State Payday Lenders in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

296.   NABC's pattern of racketeering activity shares a common target or victim: Georgia consumers, like Plaintiffs and the Class.

As a direct and proximate result of this unlawful scheme, Plaintiffs and the Class suffered damages including but not limited to amounts paid for usurious interest.

## EIGHTEENTH CLAIM FOR RELIEF
### Conspiracy to Commit Violations of O.C.G.A. §16-14-4(c) by NABC
### (On behalf of the Sub-Class)

297.   Plaintiffs incorporate by reference the preceding paragraphs.

298.   This claim is brought under Georgia's Racketeer Influenced Corrupt Organizations statute, O.C.G.A. § 16-14-1, *et. seq.*, seeking to stop and deter NABC from conspiring to practice in Defendants' unlawful enterprise, conducted through a pattern of racketeering activity, upon Georgia consumers and to provide an adequate remedy for the victims of such practices.

299.   As set forth more fully above, NABC and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to citizens of Georgia and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would violate O.C.G.A. §16-14-3(9)(A)(xxxviii).

300.   In furtherance of their conspiracy NABC and the Out-Of-State Payday Lenders agreed to take certain stapes to facilitate the collection of illegal and usurious payday loans in Georgia:

a.   Out-Of-State Payday Lenders initiated the transactions whereby Georgia borrowers' bank accounts were debited and the usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

b.   NABC then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

c.   NABC knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Georgia, and still originated ACH debit entries into the state at the request of the Out-Of-State Payday Lenders in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

301.   NABC'S participation in a conspiracy with the other Defendants to engage in a pattern of racketeering activity shares a common target or victim: Georgia consumers, like Plaintiffs and the Class.

302.   As a direct and proximate result of this conspiracy Plaintiffs and the Class suffered damages including but not limited to amounts paid for usurious interest.

**NINETEENTH CLAIM FOR RELIEF**

**Violation of O.C.G.A. §16-14-4(a) and (b) by First Premier**
**(On behalf of the Sub-Class)**

303.   Plaintiffs incorporate by reference the preceding paragraphs.

304.   This claim is brought under Georgia's Racketeer Influenced Corrupt Organizations statute, O.C.G.A. § 16-14-1, *et. seq.*, seeking to stop and deter First Premier from practicing its unlawful enterprise, conducted through a pattern of racketeering activity, upon Georgia consumers and to provide an adequate remedy for the victims of such practices.

305.   As set forth more fully above, in the course of making payday loans to consumers in Georgia, First Premier repeatedly and knowingly takes or receives monies that equate to interest in excess of that allowed by law.  Such rates compute to annual percentage rates of at least 231.71% and up to 1,378%.

306.   The ACH Network is comprised of  the following participants:

   a.   "Originators" which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.      "ODFIs" which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including First Premier;

c.      "RDFIs"  which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.      "Receivers" which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.      "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.      "Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement

with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

307.   The ACH Network constitutes an "enterprise" pursuant to O.C.G.A.§16-14-3(6) as an association of multiple legal entities operating under NACHA.  Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in O.C.G.A.§16-14-3(6) (**the "ACH Enterprise"**) in that:

    a.    Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

    b.    To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

    c.    The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

308.   The ACH enterprise collects usurious interest rates on illegal and predatory loans to Georgia consumers.  First Premier is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

309.   First Premier, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, First Premier serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through First Premier, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

310.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as First Premier, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized, meaning that it is, among other things, compliant with Georgia state law.

311.   The Out-Of-State Payday Lenders extend loans for amounts of $3,000 or less that charge unconscionable and usurious rates of interest.  The collection of

illegal amounts of interest forms the object of this enterprise and pattern of racketeering activity.

312.   First Premier has used its role within the ACH Enterprise to conduct and participate in the collection of usurious loans by originating entries on the ACH Network at the request of Out-Of State Payday Lenders (or Third-party Senders acting on their behalf) which debit the accounts of persons residing in Georgia.

313.   First Premier, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that First Premier knew were usurious under Georgia law; and originated debit entries that First Premier knew were usurious under Georgia law.

314.   First Premier's unlawful scheme constitutes an enterprise executed through a pattern of racketeering activity that included multiple and repeated criminal acts, including numerous acts of usury and theft by taking, deception and conversion, all defined as predicate acts by Georgia law.

315.   The Georgia General Assembly expressly amended the Georgia RICO statute by adding usury as a predicate act for the express purpose of combating this kind of illegal payday loan activity, O.C.G.A. §16-14-3(9)(A)(xxxviii).

316.   Pursuant to the fraudulent scheme, First Premier participated in the collection of usurious debts in that:

      a.      Out-Of-State Payday Lenders initiated the transactions whereby Georgia borrowers' bank accounts were debited and the usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

      b.      First Premier then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

      c.      First Premier knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Georgia, and still originated ACH debit entries into the state at the request of the Out-Of-State Payday Lenders in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

317.   First Premier's pattern of racketeering activity shares a common target or victim: Georgia consumers, like Plaintiffs and the Class.

318.   As a direct and proximate result of this unlawful scheme, Plaintiffs and the Class suffered damages including but not limited to amounts paid for usurious interest.

## TWENTIETH CLAIM FOR RELIEF

### Conspiracy to Commit Violations of O.C.G.A. §16-14-4(c) by First Premier
### (On behalf of the Sub-Class)

319.   Plaintiffs incorporate by reference the preceding paragraphs.

320.   This claim is brought under Georgia's Racketeer Influenced Corrupt Organizations statute, O.C.G.A. § 16-14-1, *et. seq*., seeking to stop and deter First Premier from conspiring to practice in Defendants' unlawful enterprise, conducted through a pattern of racketeering activity, upon Georgia consumers and to provide an adequate remedy for the victims of such practices.

321.   As set forth more fully above, First Premier and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to citizens of Georgia and collect usurious interest rates in violation of state law. Their endeavor, if completed, would violate O.C.G.A. §16-14-3(9)(A)(xxxviii).

322.    In furtherance of their conspiracy First Premier and the Out-Of-State Payday Lenders agreed to take certain stapes to facilitate the collection of illegal and usurious payday loans in Georgia:

      a.    Out-Of-State Payday Lenders initiated the transactions whereby Georgia borrowers' bank accounts were debited and the

usurious debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

b.    First Premier then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii);

c.    First Premier knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Georgia, and still originated ACH debit entries into the state at the request of the Out-Of-State Payday Lenders in violation of O.C.G.A. §16-14-3(9)(A)(xxxviii).

323.   First Premier's participation in a conspiracy with the other Defendants to engage in a pattern of racketeering activity shares a common target or victim: Georgia consumers, like Plaintiffs and the Class.

324.   As a direct and proximate result of this conspiracy Plaintiffs and the Class suffered damages including but not limited to amounts paid for usurious interest.

## TWENTY-FIRST CLAIM FOR RELIEF
## Violations of Georgia Payday Lending Act
### (On behalf of the Sub-Class)

325.   Plaintiffs incorporate by reference the preceding paragraphs.

326.   Pursuant to O.C.G.A. §16-17-2, it is unlawful to engage in any

business which consists of making, offering, arranging, or acting as an agent in the

making of loans of $3,000.00 or less, unless:

> (1)  Such person is engaging in financial transactions permitted pursuant to:
>
>> (A) The laws regulating financial institutions as defined under Chapter 1 of Title 7, the "Financial Institutions Code of Georgia";
>>
>> (B) The laws regulating state and federally chartered credit unions;
>>
>> (C) Article 13 of Chapter 1 of Title 7, relating to Georgia residential mortgages;
>>
>> (D) Chapter 3 of Title 7, the "Georgia Industrial Loan Act";
>>
>> (E) Chapter 4 of Title 7, relating to interest and usury;
>>
>> (F) Chapter 5 of Title 7, "The Credit Card and Credit Card Bank Act," including financial institutions and their assignees who are not operating in violation of said chapter; or
>>
>> (G) Paragraph (2) of subsection (a) of Code Section 7-4-2 in which the simple interest rate is not greater than 16 percent per annum;
>
> (2) Such loans are lawful under the terms of:
>
>> (A) Article 1 of Chapter 1 of Title 10, "The Retail Installment and Home Solicitation Sales Act";

> (B) Article 2 of Chapter 1 of Title 10, the "Motor Vehicle Sales Finance Act"; or
>
> (C) Part 5 of Article 3 of Chapter 12 of Title 44, relating to pawnbrokers;
>
> (3) Subject to the provisions of paragraph (4) of subsection (b) of this Code section, such person is a bank or thrift chartered under the laws of the United States, a bank chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation, or a credit card bank and is not operating in violation of the federal and state laws applicable to its charter; or
>
> (4) Such loan is made as a tax refund anticipation loan. In order to be exempt under this paragraph the tax refund anticipation loan must be issued using a borrower's filed tax return and the loan cannot be for more than the amount of the borrower's anticipated tax refund. Tax returns that are prepared but not filed with the proper government agency will not qualify for a loan exemption under this paragraph.

327. As set forth more fully above and incorporated by reference herein, the Out-Of-State Payday Loans made to Plaintiffs in Georgia featured principal amounts of less than $3,000 and neither the Out-Of-State Payday Lenders nor the Out-Of-State Payday Loans qualified for any exception available under O.C.G.A. §16-17-2.

328. BMO, Four Oaks, NBCal, NABC, and First Premier acted as agents to the Out-Of-State Payday Lenders in violation of the Georgia Payday Lending Act

by providing the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme.

329.   In providing the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme, Defendants knowingly acted as agents to the illegal lending activities of the Out-Of-State Payday Lenders.

330.   At the time Defendants provided the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme, they knew the identity of the Out-Of-State Payday Lenders, including their unlawful activity.

331.   Defendants were aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures.

332.   As a result of Defendants' conduct, the Sub-Class was harmed.

333.   As a result of BMO, Four Oaks, NBCal, NABC, and First Premier's knowing participation in the making of illegal payday loans, each is liable for violation of the Georgia Payday Lending Act referenced herein.

## TWENTY-SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Georgia Payday Lending Act
**(On behalf of the Sub-Class)**

334.   Plaintiffs incorporate by reference the preceding paragraphs.

Pursuant to O.C.G.A. §16-17-2, it is unlawful to engage in any business which consists of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less, unless:

> (1) Such person is engaging in financial transactions permitted pursuant to:
>
>> (A) The laws regulating financial institutions as defined under Chapter 1 of Title 7, the "Financial Institutions Code of Georgia";
>>
>> (B) The laws regulating state and federally chartered credit unions;
>>
>> (C) Article 13 of Chapter 1 of Title 7, relating to Georgia residential mortgages;
>>
>> (D) Chapter 3 of Title 7, the "Georgia Industrial Loan Act";
>>
>> (E) Chapter 4 of Title 7, relating to interest and usury;
>>
>> (F) Chapter 5 of Title 7, "The Credit Card and Credit Card Bank Act," including financial institutions and their assignees who are not operating in violation of said chapter; or
>>
>> (G) Paragraph (2) of subsection (a) of Code Section 7-4-2 in which the simple interest rate is not greater than 16 percent per annum;
>
> (2) Such loans are lawful under the terms of:
>
>> (A) Article 1 of Chapter 1 of Title 10, "The Retail Installment and Home Solicitation Sales Act";

(B) Article 2 of Chapter 1 of Title 10, the "Motor Vehicle Sales Finance Act"; or

(C) Part 5 of Article 3 of Chapter 12 of Title 44, relating to pawnbrokers;

(3) Subject to the provisions of paragraph (4) of subsection (b) of this Code section, such person is a bank or thrift chartered under the laws of the United States, a bank chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation, or a credit card bank and is not operating in violation of the federal and state laws applicable to its charter; or

(4) Such loan is made as a tax refund anticipation loan. In order to be exempt under this paragraph the tax refund anticipation loan must be issued using a borrower's filed tax return and the loan cannot be for more than the amount of the borrower's anticipated tax refund. Tax returns that are prepared but not filed with the proper government agency will not qualify for a loan exemption under this paragraph.

335.   As set forth more fully above and incorporated by reference herein, the Out-Of-State Payday Loans made to Plaintiffs in Georgia featured principal amounts of less than $3,000 and neither the Out-Of-State Payday Lenders nor the Out-Of-State Payday Loans qualified for any exception available under O.C.G.A. §16-17-2.

336.   BMO, Four Oaks, NBCal, NABC, and First Premier aided and abetted the Out-Of-State Payday Lenders' violations of the Georgia Payday Lending Act

by providing the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme.

337.   In providing the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme, Defendants knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Out-Of-State Payday Lenders.

338.   At the time Defendants provided the necessary access to the ACH Network to carry out the Out-Of-State Payday Lenders' illegal scheme, they knew the identity of the Out-Of-State Payday Lenders, including their unlawful activity.

339.   Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

340.   Defendants were aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures.

341.   As a result of Defendants' conduct, the Sub-Class was harmed.

342.   As a result of BMO, Four Oaks, NBCal, NABC, and First Premier's knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of the Georgia Payday Lending Act referenced herein.

## TWENTY-THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Georgia Criminal Usury Statute
**(On Behalf of the Sub-Class)**

343.   Plaintiffs incorporate by reference the preceding paragraphs.

344.   Pursuant to O.C.G.A. §7-4-18, it is unlawful to reserve, charge, or take any money or other property as interest on a loan or forbearance of any money at a rate exceeding five per cent per month (5%).

345.   As set forth more fully above, in the course of making payday loans to consumers in Georgia, the Out-Of-State Payday Lenders repeatedly take or receive monies that equate to interest in excess of 5%, in violation of O.C.G.A. §7-4-18.

346.   Defendants aided and abetted the Out-Of-State Payday Lenders' violations of Georgia criminal usury law.

347.   On the dates specified above, Defendants credited and withdrew money from Plaintiff's checking accounts and electronically transmitted it to the Out-Of-State Payday Lenders.

348.   In making these withdrawals, credits and transmissions, Defendants knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Out-Of-State Payday Lenders.

349.   At the time Defendants made these electronic withdrawals and transfers, they knew the identity of the Out-Of-State Payday Lenders, including their unlawful activity.

350.   Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

351.   Defendants were aware or should have been aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures.

352.   At the time Defendants transmitted these funds, they knowingly assisted the Out-Of-State Payday Lenders and were incentivized to do so by a bare profit motive.

353.   As a result of Defendants' knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of the Georgia criminal usury law referenced herein.

## TWENTY-FOURTH CAUSE OF ACTION
### Permanent Injunctive Relief
#### (On behalf of the Class and Sub-Class)

354.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

355.   Defendants BMO, Four Oaks, NBCal, NABC, and First Premier should be enjoined and prohibited from serving as the ODFI for Out-Of-State Payday Lenders and directed to immediately credit to all Out-Of-State Payday Lender borrowers, any money they have debited from borrowers' accounts but not yet remitted to Out-Of-State Payday Lenders.

## TWENTY-FIFTH CLAIM FOR RELIEF
### Money Had and Received Against All Defendants
#### (On behalf of the Sub-Class)

356.   Plaintiffs incorporate by reference the preceding paragraphs.

357.   Defendants BMO, Four Oaks, NBCal, NABC, and First Premier received funds belonging to Plaintiffs and the Sub-Class.

358.   Defendants BMO, Four Oaks, NBCal, NABC and First Premier's receipt of money belonging to Plaintiffs and the Sub-Class was improper because the money represented repayments of debts that were illegal and unenforceable.

359.   Defendants BMO, Four Oaks, NBCal, NABC, and First Premier benefited from receipt of the funds.

360.   Plaintiffs and the Sub-Class are entitled to return of the funds received by BMO, Four Oaks, NBCal, NABC, and First Premier.

361.   Because the funds received from Plaintiffs and the Sub-Class are, upon information and belief, no longer in the possession of BMO, Four Oaks,

NBCal,  NABC, and First Premier, Plaintiffs have a right to restitution *at law* from BMO, Four Oaks, NBCal, NABC, and First Premier.

**TWENTY-SIXTH CLAIM FOR RELIEF**

**Unjust Enrichment**
**(On behalf of the Sub-Class)**

362.   Plaintiffs re-allege the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

363.   BMO, Four Oaks, NBCal, NABC, and First Premier in their roles as ODFIs, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

364.   BMO, Four Oaks, NBCal, NABC, and First Premier charged and retained a transaction fee for each debit entry they originated on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

365.   BMO, Four Oaks, NBCal, NABC, and First Premier received and retained wrongful benefits from Plaintiffs and the Sub-Class in the form of such transaction fees.

366.   As a result of BMO, Four Oaks, NBCal, NABC, and First Premier's wrongful conduct as alleged herein, BMO, Four Oaks, NBCal, NABC, and First Premier have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Sub-Class.

367.   BMO, Four Oaks, NBCal, NABC, and First Premier's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

368.   It is inequitable for BMO, Four Oaks, NBCal, NABC, and First Premier to be permitted to retain the benefits they received, and are still receiving, without justification, from originating debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf).  BMO, Four Oaks, NBCal, NABC, and First Premier's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

369.   The financial benefits derived by BMO, Four Oaks, NBCal, NABC, and First Premier rightfully belong to Plaintiffs and members of the Sub-Class. BMO, Four Oaks, NBCal, NABC, and First Premier should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Sub-Class all wrongful or inequitable proceeds received from them.  A constructive

trust should be imposed upon all wrongful or inequitable sums received by BMO, Four Oaks, NBCal, NABC, and First Premier traceable to Plaintiffs and the members of the Sub-Class.

370.   Plaintiffs and members of the Sub-Class have no adequate remedy at law.

**WHEREFORE**, Plaintiffs on their behalf and on behalf of the Class seeks judgment in an amount to be determined at trial but not less than $5,000,000, as follows:

(a)   Under 18 U.S.C. § 1964(c), awarding each  member of Class and Sub-Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(b)   Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(c)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from Four Oaks for Four Oak's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which Four Oaks was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(d)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from Four Oaks for Four Oak's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which Four Oaks was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(e)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from NBCal for NBCal's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which NBCal was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(f)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from NBCal for NBCal's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their

account in which NBCal was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(g)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from NABC for NABC's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which NABC was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(h)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from NABC for NABC's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which NABC was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(i)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and Sub-Class damages from First Premier for First Premier's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(j)     Under 18 U.S.C. § 1964(c), awarding each  member of the Class and
Sub-Class damages from First Premier for First Premier's violations
of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit
from their account in which First Premier was the ODFI and which
represented repayment of a loan from an Out-Of-State Payday Lender,
trebled;

(k)     Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class
damages from BMO for BMO's violations of O.C.G.A. §16-14-4(a)
and (b) consisting of a refund of every ACH debit from their account
in which BMO was the ODFI and which represented repayment of a
loan from an Out-Of-State Payday Lender, trebled;

(l)     Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class
damages from BMO for BMO's violations of O.C.G.A. §16-14-4(c)
consisting of a refund of every ACH debit from their account in which
BMO was the ODFI and which represented repayment of a loan from
an Out-Of-State Payday Lender, trebled;

(m)    Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class
damages from Four Oaks for Four Oaks' violations of O.C.G.A. §16-
14-4(a) and (b) consisting of a refund of every ACH debit from their

account in which Four Oaks was the ODFI and which represented

repayment of a loan from an Out-Of-State Payday Lender, trebled;

(n)     Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class

damages from Four Oaks for Four Oaks' violations of O.C.G.A. §16-

14-4(c) consisting of a refund of every ACH debit from their account

in which Four Oaks was the ODFI and which represented repayment

of a loan from an Out-Of-State Payday Lender, trebled;

(o)     Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class

damages from NBCal for NBCal's violations of O.C.G.A. §16-14-4(a)

and (b) consisting of a refund of every ACH debit from their account

in which NBCal was the ODFI and which represented repayment of a

loan from an Out-Of-State Payday Lender, trebled;

(p)     Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class

damages from NBCal for NBCal's violations of O.C.G.A. §16-14-4(c)

consisting of a refund of every ACH debit from their account in which

NBCal was the ODFI and which represented repayment of a loan

from an Out-Of-State Payday Lender, trebled;

(q)     Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class

damages from NABC for NABC's violations of O.C.G.A. §16-14-4(a)

and (b) consisting of a refund of every ACH debit from their account in which NABC was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(r)     Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class damages from NABC for NABC's violations of O.C.G.A. §16-14-4(c) consisting of a refund of every ACH debit from their account in which NABC was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(s)     Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class damages from First Premier for First Premier's violations of O.C.G.A. §16-14-4(a) and (b) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(t)     Under O.C.G.A. §16-14-6, awarding each member of the Sub-Class damages from First Premier for First Premier's violations of O.C.G.A. §16-14-4(c) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender, trebled;

(u)     Under O.C.G.A. §16-17-2(d), awarding each member of the Sub-Class damages from Defendants for Defendants' violations of O.C.G.A. §16-17-2(a) consisting of a refund of every ACH debit from their account in which Defendants were the ODFIs and which represented repayment of a loan from an Out-Of-State Payday Lender;

(v)     Under O.C.G.A. §16-17-2(d), awarding each member of the Sub-Class damages from Defendants for Defendants' violations of O.C.G.A. §16-17-2(d) consisting of a refund of every ACH debit from their account in which Defendants were the ODFIs and which represented repayment of a loan from an Out-Of-State Payday Lender;

(w)     Awarding the Sub-Class damages against all Defendants for their aiding and abetting  in the violations of the Georgia Payday Lending Act;

(x)     Awarding the Sub-Class damages against all Defendants as aiders and abettors to the violations of the Georgia criminal usury law;

(y)     Granting a permanent injunction enjoining and prohibiting BMO, Four Oaks, NBCal, NABC, and First Premier from serving as the ODFI for Out-Of-State Payday Lenders and directing BMO, Four Oaks, NBCal, NABC, and First Premier to immediately credit to all

Out-Of-State Payday Lenders' borrowers, any money they have debited from borrowers' accounts but have not yet remitted to Out-Of-State Payday Lenders;

(z)    Permitting each member of the Sub-Class to recover damages for Money Had and Received from all Defendants consisting of a refund of every ACH debit from their account in which Defendants were the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender;

(aa)    Permitting each member of the Sub-Class to recover damages in restitution *at law* from all Defendants consisting of a refund of every ACH debit from their account in which Defendants were the ODFI and which represented repayment of a loan from an Out-Of-State Payday Lender;

(bb)    Compelling BMO, Four Oaks, NBCal, NABC, and First Premier to disgorge in a common fund for the benefit of Plaintiffs and members of the Sub-Class all wrongful or inequitable proceeds received from them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by BMO, Four Oaks, NBCal, NABC, and First Premier traceable to Plaintiffs and the members of the Sub-Class;

(cc)    Awarding Plaintiffs attorneys' fees and costs in pursuing this action; and

(dd)    Awarding such other and further relief as this Court deems just, proper and equitable.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a jury trial in the instant action.

Dated:  October 4, 2013.

Respectfully submitted,

**CHITWOOD HARLEY HARNES LLP**

By: /s  Darren T. Kaplan
　　Darren T. Kaplan
　　(Ga. Bar No. 172670)

　　1350 Broadway, Suite 908
　　New York, NY 10018
　　Tel:　　(917) 595-4600
　　Fax:　　(404) 876-4476
　　dkaplan@chitwoodlaw.com

　　Krissi T. Gore (Ga. Bar No. 687020)
　　Meryl W. Roper (Ga. Bar No. 238919)
　　Ze'eva Kushner Banks (Ga. Bar No. 430416)
　　1230 Peachtree Street, NE, Suite 2300
　　Atlanta, GA 30309
　　kgore@chitwoodlaw.com
　　mroper@chitwoodlaw.com
　　zkbanks@chitwoodlaw.com

　　*Counsel for Plaintiff and the Class*

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel, *pro hac vice forthcoming*
Steve Six, *pro hac vice forthcoming*
J. Austin Moore, *pro hac vice forthcoming*
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel:    (816) 714-7100
Fax:    (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow, *pro hac vice forthcoming*
Jason H. Alperstein, *pro hac vice forthcoming*
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301
Tel:    (954) 525-4100
Fax:    (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei, *pro hac vice forthcoming*
Jeffrey D. Kaliel, *pro hac vice forthcoming*
Anna C. Haac, *pro hac vice forthcoming*
2000 L Street, NW
Suite 808
Washington, D.C. 20036
Tel:    (202) 973-0900
Fax:    (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com
ahaac@tzlegal.com